Gants, J.
On January 18, 2001, the Massachusetts Civil Service Commission (“the Commission”) found that the plaintiff, the Boston Police Department (“BPD”), had failed to prove that the defendant James Munroe (“Munroe”) was psychologically unfit to perform the duties of a police officer and directed the Personnel Administrator to place Munroe’s name at the top of the eligibility list for new police officer positions. Commission Decision at 11. The BPD now seeks review from this Court of the Commission’s decision under G.L.c. 30A, § 14. All parties have moved for judgment on the pleadings. After hearing, for the reasons detailed below, the BPD’s motion for judgment on the pleadings is ALLOWED, and the defendants’ motions for judgment on the pleadings is DENIED. As a result, the Commission’s decision dated January 18, 2001 is hereby VACATED and the BPD’s decision not to appoint Munroe as a Boston police officer is upheld.
BACKGROUND
Under G.L.c. 147, §21A, the BPD since 1968 has been permitted to appoint police cadets to perform solely administrative duties. These appointments are not subject to the civil service law or rules, and a police cadet is not entitled to the benefit of any civil service law or rules. G.L.c. 147, §21A. Until 1972, a police cadet’s training and experience helped him to win appointment as a Boston police officer, because training and experience were weighted components of the police services entrance examination. When these components were eliminated in 1972, the BPD cadet program temporarily died because many persons had chosen to become cadets precisely because the program had helped them to obtain appointments as police officers and it no longer did. The last cadet left the BPD program on June 22, 1976. To resurrect the cadet program, the BPD sought and obtained the help of the Legislature, which passed legislation in 1978, as later amended in 1979 and 1984, that provided:
Notwithstanding the provisions of chapter thirty-one of the General Laws [which govern civil service], any person who has completed not less than two years of service as a police cadet in the police department of the city of Boston . . . may, subject to a program established by the police commissioner of said city and approved by the personnel administrator of the state division of personnel administration and the Massachusetts criminal justice training council, be appointed to fill a vacancy in a position in the lowest grade in the police force of said city without certification from an eligible list prepared under the provisions of chapter thirty-one of the General Laws; and provided, further, that such person either is on a police entrance eligible list prepared under said chapter thirty-one or passes a qualifying examination to be given by said personnel administrator.[1]
St. 1984, c. 277, §1. Under this legislation, as many as one-third of the newly appointed police officers could be chosen by the Boston Police Commissioner from the ranks of police cadets. St. 1979, c. 560, §2. The balance of the new police officer appointments must come from the certified list provided by the Human Resources Division of the Executive Office for Administration and Finance, which essentially is the list of those who scored highest on the Civil Services Examination.[2] G.L.c. 31, §25.
In November 1998, the BPD requested a certification list from the Human Resources Division to make 60 original appointments of new police officers to the Boston Police Academy in the spring of 1999. On November 19, 1998, the Human Resources Division certified a list of 121 eligible persons to be considered for appointment as new police officers. Munroe, although he had passed the Civil Service Examination, had not scored high enough to be among the 121 eligible persons on the certified list. However, since *447 Munroe had been a Boston police cadet since December 21, 1994, he could be considered for these new police officer positions under the resurrected Boston police cadet program. In February 1999, Munroe was given a conditional offer of employment as a new Boston police officer: the condition was that he successfully complete the same medical and psychological screening that all new police recruits must undergo before they are allowed to enter the Police Academy.
As part of the psychological screening, Munroe was required to take a battery of psychological tests, followed by an interview with Dr. Anthony Kalinowski, a licensed psychologist. Prior to the interview on April 6, 1999, Dr. Kalinowski had reviewed the results of Munroe’s psychological tests and his BPD file, which contained background information. After the 30-40 minute interview, Dr. Kalinowski initially concluded that Munroe ought to be accepted into the Police Academy, but he was uneasy about this recommendation because of the events surrounding Munroe’s 1994 nolo contendere plea to two counts of battery in a Key West, Florida court, for which the adjudication of guilt was withheld and he was placed on probation for one year.[3] According to the police report regarding that offense, two police officers were on spring break detail on March 20, 1994 when they observed Munroe and a second man punch a third man who was on the ground, then kick the third man, then walk away only to return and kick the third man again. The victim suffered multiple cuts, broken teeth, and was incoherent when first approached by the police officers.
Following the interview, Dr. Kalinowski conferred about Munroe with Dr. David Morris, who supervised the candidate screening. When these two psychologists evacuated to the street following a fire alarm, both of them ran into Sergeant Detective Robert Tinker, who had conducted the background investigations of these candidates for the BPD. Detective Tinker noted that he had spoken to the arresting officer in the Key West incident, who observed that the 1994 battery involved significant violence. After further review, on April 12, 1999, Dr. Kalinowski prepared a letter finding that Munroe failed the psychological screening.[4] Dr. Kalinowski noted that, in discussing the 1994 battery, Munroe said it was a mistake and that he should have walked away. Dr. Kalinowski believed that Munroe had downplayed the severity of the injuries inflicted, the role alcohol may have played in what happened, and his responsibility for what occurred. While acknowledging that the psychologist whom Munroe consulted with for a year following this adjudication had found “no psychological disturbance,” that Munroe was a hard worker, that Munroe was motivated to be a police officer, and that he presented himself well, Dr. Kalinowski concluded that the seriousness of the offense leading to Munroe’s arrest and Munroe’s incomplete insight into his assaultive conduct were sufficient to find him a psychological failure. He referred Munroe to Dr. Julia Reade for a second opinion in accordance with the Plan for Psychological/Psychiatric Screening of Public Safety Candidates (“the Plan”) that the BPD had adopted. Dr. Morris, who had not met Munroe, joined in Dr. Kalinowski’s conclusion.
Dr. Reade, a licensed staff psychiatrist at Massachusetts General Hospital, interviewed Munroe again on April 13, 1999 for roughly 30 minutes. She, too, was troubled by Munroe’s attitude towards the 1994 battery. She wrote:
Mr. Monroe [sic] regretted the incident primarily because it had impeded his progression toward his goal of becoming a police officer, not because he had participated in a serious assault on another human being. This gives rise to the concern that Mr. Monroe [sic] is unable, even in retrospect, to reflect on his impulsive actions, and is therefore at risk for repeating them. This casts doubt on Mr. Monroe’s [sic] suitability for a job which requires equanimity in the face of serious provocation, a capacity to reflect on one’s decisions and to admit mistakes.
As a result, she concluded that he was “not acceptable” as a police officer candidate. Under the Plan, this second finding that he was not psychologically accept-. able to be a Boston police officer doomed Munroe’s candidacy. On April 30, 1999, the BPD informed him that he had failed to meet the eligibility criteria for appointment as a Boston police officer, and would not be part of the May 1999 recruit class at the Police Academy.
Munroe appealed the recission of the BPD’s conditional offer of employment as a police officer to the Commission. Among the witnesses at the Commission’s hearing was Dr. John Greene, a licensed psychiatrist and presently the Director for Crisis Intervention with the Boston Medical Center. Munroe had been referred to Dr. Greene after his Florida adjudication to fulfil the condition of his probation requiring anger management training. Dr. Greene had provided therapy to Munroe consisting of education, relaxation techniques, cognitive behavioral techniques, and psychological strategies for dealing with stress. Dr. Greene criticized the testing and clinical methods used in BPD’s psychological evaluation of Munroe. He also opined that Munroe does not have an anger problem and did not show a lack of remorse. A psychiatric evaluation of Munroe conducted by Dr. Domenic Ciraulo was also submitted at the hearing. Dr. Ciraulo is the Chairman of the Division of Psychiatry at Boston University School of Medicine and Chief of the Psychiatry Service at the Outpatient Clinics of the Boston Veteran’s Administration Medical Center. Based on his August 30, 2000 interview of Munroe, Dr. Ciraulo concluded that there was no evidence that Munroe suffered from any psychiatric disorder, personality disorder, or any other psychological condition that would make him unfit to serve as a police officer. He found that Munroe expressed appropriate remorse *448 for the 1994 battery in Florida and “possessed a reasonable degree of insight into the futility of violence in solving problems.”
After the hearing, the Commission found:
The process used in evaluating [Munroe] is flawed and violated the basic merit principles as-set out in G.L.c. 31. The [BPD] has also failed [to] show by a preponderance of the evidence that Mr. Munroe was psychologically unfit to perform the duties of a police officer. There is sufficient evidence to suggest that [Munroe] is psychologically fit to perform the duties of a police officer.
Decision at 11. The Commission then directed the Personnel Administrator to place Munroe’s name at the top of the eligibility list as a Boston police officer, so that he would again be conditionally offered employment as a police officer when the next group of recruits were appointed. Id. The Commission also directed that, once the conditional offer was made, an independent psychiatrist be agreed upon to perform the psychological screening of Munroe and, if the parties could not agree upon a psychiatrist, the Commission would select one from names provided by each party. Id. The BPD now seeks review of the Commission’s decision under G.L.c. 30A, §14.
DISCUSSION
G.L.c. 30A, §14 grants any person or entity who is aggrieved by a decision of any agency in an adjudicatory proceeding the right to appeal that decision to the Superior Court. This Court may reverse or modify the agency decision “if it determines that the substantial rights of any party may have been prejudiced because the agency decision is unsupported by substantial evidence; or arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.” G.L.c. 30A, §14(7). When reviewing an agency’s decision, “the court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." Id. This Court reverses and vacates the decision of the Commission on two separate and independent grounds.
1.The Commission Was Without Jurisdiction to Review BPD’s Decision
First, the Commission did not have jurisdiction to review the BPD’s decision to rescind Munroe’s conditional offer of employment as a police officer. As discussed above, Munroe did not score high enough on the Civil Service Examination to be included on the certified list of those eligible for appointment under G.L.c. 31. He was given a conditional offer of employment only because, under St. 1984, c. 277, the Police Commissioner was permitted to select a certain number of police cadets as new police officers, provided they had received a passing score on the Civil Service Examination.
There is no dispute that the appointment of persons as police cadets is not subject to the civil service law or rules, and that a police cadet is not entitled to the benefit of civil service law or rules. G.L.c. 147, §21A. Nor can there be any dispute that, under St. 1984, c. 277, the BPD has the discretion to determine which cadets it would appoint as new police officers. St. 1984, c. 277 left such decisions in the hands of the Boston Police Commissioner, provided the cadet program he established was approved by the Personnel Administrator of what was then called the Division of Personnel Administration. The cadet program submitted to the Personnel Administrator on June 27, 1978 and approved by him on January 16, 1979 provided for four steps in that appointment process:
1. The qualified cadet submits a detailed history background form;
2. the cadet undergoes the same background screening, interviewing, and psychological and medical testing as candidates on the certified list;
3. the cadet applicant is rated and ranked by a panel of three members of the Command Staff; and
4. the Police Commissioner considers the cadet applicants “in order of their standing in the Command Staff ranking.”
Letter from Police Commissioner Joseph Jordan to Personnel Administrator Wallace Kountze, June 27, 1978 (“Jordan letter”). Apart from approving the cadet program, the Personnel Administrator has no role in the decision of which cadets to appoint as new police officers; that decision rests solely with the Boston Police Commissioner. The appointment of these cadets as police officers, plain and simple, is outside the scope of the civil service law and rules under G.L.c. 31, and therefore outside the scope of the Commission’s review. See G.L.c. 31, §2 (Commission review limited to those “aggrieved” because of decisions, acts, or failures to act that were in violation of G.L.c. 31, or in violation of “the rules or basic merit principles promulgated thereunder”).
Indeed, the BPD' s cadet program proposal approved by the Personnel Administrator provided for a cadet’s right to appeal to the Personnel Administrator (and, ultimately, to the Commission) just one decisionthe decision that a cadet was disqualified for appointment because he failed to meet the Civil Service requirements for a police officer. Jordan letter at 3. The right to appeal was extended to no other aspect of the appointment decision, which acknowledges that no further right of appeal exists. There can be no dispute that Munroe’s conditional offer was rescinded, not because he was disqualified for failure to meet a Civil Service requirement, but because there was too high a risk that he was psychologically unfit for police work. In short, the appointment of cadets as new police officers, like the appointment of new cadets, is not subject to the civil service law or rules, and a cadet may not seek Commission review regarding the denial *449 or withdrawal of his appointment. Commission review is appropriate only to challenge whether a cadet was properly disqualified from consideration for such an appointment because the cadet failed to satisfy a civil service requirement, such as passing the Civil Service Examination.
One comes to the same conclusion if one looks at this issue from a different angle. There is nothing in the cadet program that prevented the Police Commissioner from conducting the psychological screening before the Command Staff panel ranking, and considering the results of this screening in making its rankings. Certainly, if the Command Staff panel members were aware of the BPD’s psychologists’ concerns that Munroe might abuse his authority or use excessive force if given a badge, they were permitted to give him a lower rank, and this discretionary decision would not be subject to Commission review. Here, for whatever reason, the BPD chose to postpone the psychological screening until after the ranking had been made and the Commissioner had made conditional offers to certain cadets. Since the Commission lacked jurisdiction to review the Commissioner’s decision not to grant a cadet a conditional appointment as a new police officer, it should not have jurisdiction to review his decision to rescind that conditional appointment.
The same outcome emerges if one looks at this issue from yet another angle. The Commission has jurisdiction under G.L.c. 31, §2 only when a person is “aggrieved” because of decisions, acts, or failures to act that were in violation of G.L.c. 31, or in violation of “the rules or basic merit principles promulgated thereunder.” G.L.c. 31, §2. Munroe can point to no specific violation of the civil service law or rules that he contends were violated here by the BPD; he contends instead that the BPD violated “basic merit principles.” That term of art is defined in G.L.c. 31, § 1 to mean, in pertinent part: “(a) recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills including open consideration of qualified applicants for initial appointments; . . . and (f) assuring that all employees are protected against coercion for political purposes, and are protected from arbitrary and capricious actions.” G.L.c. 31, §1. It is plain that sub-paragraph (a) does not apply to the appointment of new BPD police officers from the ranks of police cadets since those appointments specifically may be made “[n]otwithstanding the provisions of chapter thirty-one of the General Laws.” St. 1984, c. 277. Therefore, if there were any violation of “basic merit principles” here that would give the Commission jurisdiction, it must rest on Munroe’s claim that the BPD’s actions were “arbitrary and capricious.” If this is the sole basis for jurisdiction, the Commission decision must still be vacated, because there can be no doubt that the BPD’s determination that Munroe was psychologically unfit for police work was not arbitrary and capricious. It cannot be deemed arbitrary and capricious for the BPD to rely on the findings of two independent licensed psychologists that Munroe’s violent conduct in Florida and his apparent attitude towards that conduct poses too great a risk that Munroe will abuse his power and use excessive force if he were to become a police officer. See Cambridge v. Civil Service Commission, 43 Mass.App.Ct. 300, 303 (1997) (“A decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support”).
2. The Commission Exceeded Its Appropriate Scope of Review
The second independent ground for reversal is that, even if the Commission had jurisdiction to review the rescission of Munroe’s conditional offer and even if it were not limited to the determination of whether that recission was arbitrary and capricious, the Commission still exceeded its appropriate scope of review. Under Cambridge v. Civil Service Commission, the Appeals Court declared that the proper legal standard the Commission must apply is “whether, on the basis of the evidence before it, the appointing authority has sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority.” 43 Mass.App.Ct. at 303.
“Justified,” in the context of review, means “done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind, guided by common sense and by correct rules of law.” Selectmen of Wakefield v. Judge of First Dist. Court of Eastern Middlesex, 262 Mass. 477 (1928) . . .
In making that analysis, the commission must focus on the fundamental purposes of the civil service systemto guard against political considerations, favoritism, and bias in governmental employ-, ment decisions, including, of course, promotions, and to protect efficient public employees from political control . . . When there are, in connection with personnel decisions, overtones of political control or objectives unrelated to merit standards or neutrally applied public policy, then the occasion is appropriate for intervention by the commission. It is not within the authority of the commission, however, to substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority ... In the task of selecting public employees of skill and integrity, appointing authorities are invested with broad discretion.
Id. at 304-05 (citations omitted).
Here, the Commission did not determine whether the BPD had proven that there was “reasonable justification” for its decision; it made its own de novo determination that, by a preponderance of the evidence, Munroe was psychologically fit to perform the duties of a police officer. See Decision at 11. In short, *450 the Commission did precisely what the Appeals Court warned against in the Cambridge decisionit “substitute[d] its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority.” Cambridge v. Civil Service Commission, 43 Mass.App.Ct. at 304. BPD’s decision to rescind Munroe’s conditional officer involved no “overtones of political control or objectives unrelated to merit standards or neutrally applied public policy.” Id. If the Police Commissioner had not wanted Munroe to become a new police officer for political reasons, he would not in his discretion have selected him from the cadet program. The only reason why BPD rescinded its offer is because the two psychologists who interviewed him during his screening had serious concerns about his psychological fitness. No doubt, this finding involves the exercise of informed judgment, and reasonable psychologists may differ in their findings, as they did here. Yet, if, as the Appeals Court has declared, the appointing authority is invested with broad discretion in selecting public employees of skill and integrity, id., a police department must be found reasonably justified in deciding that an applicant is psychologically unfit to become a police officer when:
that applicant five years before had participated in a severe beating, and
two independent psychologists were so concerned about his involvement in that assault and his reaction to it that they found him psychologically unacceptable.
Nowhere is the danger of the Commission reaching beyond its proper role more acute than in matters such as these. The Commission, based on its own de novo preponderance finding, is prepared to give Munroe a badge, a gun, and all the considerable powers of a police officer as long as an independent psychologist (perhaps even one that the Commission, not the BPD, chose) declares Munroe to be fit for duty. The BPD essentially determined that this was too risky a course, but the Commission preferred the findings of Munroe’s psychologists, who thought the risks far lower. If the Commission’s decision were to be affirmed but the BPD’s assessment of risk proved the more accurate, it would be the BPD, not the Commission, who would answer to the charges of abuse of authority and excessive force. Since the Boston Police Commissioner, not the Commission, bears the responsibility for how BPD officers conduct themselves on the job, the Commission should not overrule the Police Commissioner’s hiring decisions if they are supported by reasonable justification.
ORDER
For the reasons detailed above, it is hereby ORDERED that BPD’s motion for judgment on the pleadings is ALLOWED, and the defendants’ motions for judgment on the pleadings is DENIED. As a result, the Commission’s decision dated January 18, 2001 is hereby VACATED and the BPD’s decision not to appoint Munroe as a Boston police officer is upheld.

 The Personnel Administrator of the state Division of Personnel Administration is now the Personnel Administrator of the Human Resources Division within the Executive Office for Administration and Finance. G.L.c. 31, §2 (as amended in 1998).

 Under Personnel Administration Rules 9 (“PAR.09”), if ten positions are to be selected from the regular certification list, 21 candidates (2x + 1) from the eligible list with the highest scores could be considered to fill these positions.

 This adjudication appears to be similar to a continuance without a finding in a Massachusetts District Court.

 Dr. Kalinowski testified that he sent this letter on that date but, when he learned that the letter could not be located, re-submitted the letter with the date of the re-submission July 26, 1999.